IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Civil Case No. 1:25-cv-1955 |
| | ) |
| 698,482.2222 USDT TOKENS SEIZED FROM THE CRYPTOCURRENCY WALLET ADDRESS IDENTIFIED BY TSJ5r9J16Mhu2waHz6TPtETcyaydSVPJtE, | ) ) ) ) ) |
| | ) |
| and | ) |
| | ) |
| 263,212.73392 USDT TOKENS SEIZED FROM THE CRYPTOCURRENCY WALLET ADDRESS IDENTIFIED BY TUfCTDzuhpmsP99enEG7Lfn3XzBv4BoZc1, | ) ) ) ) |
| | ) |
| Defendants *in Rem.* | ) |

**VERIFIED COMPLAINT FOR FORFEITURE IN REM**

COMES NOW the plaintiff, United States of America, by and through its counsel, Lindsey Halligan, United States Attorney for the Eastern District of Virginia and by Annie Zanobini, Assistant United States Attorney, and Rebecca Fisher, Trial Attorney, and brings this complaint and alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

**NATURE OF THE ACTION**

1. The United States brings this action *in rem* seeking the forfeiture of all right, title and interest in the defendants *in rem* identified in the case caption above (together, the

1

"Defendant Property"). The Defendant Property is subject to forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(C) and (a)(1)(A).

## THE DEFENDANTS IN REM

2.  Defendant 698,482.2222 USDT Tokens ("Defendant A") was seized from a cryptocurrency wallet address identified by TSJ5r9J16Mhu2waHz6TPtETcyaydSVPJtE and is currently held in a cryptocurrency wallet address controlled by the United States Secret Service ("USSS") in the District of Columbia.

3.  Defendant 263,212.73392 USDT Tokens ("Defendant B") was seized from a cryptocurrency wallet address identified by TUfCTDzuhpmsP99enEG7Lfn3XzBv4BoZc1 and is currently held in a cryptocurrency wallet address controlled by the USSS in the District of Columbia.

## JURISDICTION AND VENUE

4.  This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a) and (b).

5.  This Court has *in rem* jurisdiction over the Defendant Property under 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Eastern District of Virginia.

6.  Venue is proper in this judicial district under 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Eastern District of Virginia.

**BASIS FOR FORFEITURE**

7. 18 U.S.C. § 981(a)(1)(C) provides for the forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to any offense constituting a specified unlawful activity ("SUA"), as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such SUA. 18 U.S.C. § 1956(c)(7)(A) provides that any act or activity constituting an offense under 18 U.S.C. § 1961(1) constitutes an SUA, with the exception of an act indictable under subchapter II of Chapter 53 of Title 31 of the United States Code. 18 U.S.C. § 1961(1) references violations of 18 U.S.C. § 1343.

8. 18 U.S.C. § 981(a)(1)(A) provides for the forfeiture of any property, real or personal, involved in a violation or attempted violation of 18 U.S.C. § 1956, or any property traceable to such property.

**STATEMENT OF FACTS**

9. The USSS seized the Defendant Property from criminals involved in investment fraud scams. The United States of America seeks to lawfully forfeit the Defendant Property to punish and deter criminal activity by depriving criminals of property used in or acquired through illegal activities and to recover assets that may be used to compensate victims.[1]

A. <u>Background on Cryptocurrency</u>

10. **Virtual Currency:** Virtual currencies are digital tokens of value circulated over the Internet as substitutes for traditional fiat currency. Virtual currencies are not issued by any government or bank like traditional fiat currencies such as the U.S. dollar, but rather are

---

[1] *See* United States Asset Forfeiture Program, *Our Mission*, https://www.justice.gov/afp.

generated and controlled through computer software. Bitcoin is currently one of the most popular virtual currencies in use.

11. **Virtual Currency Address:** Virtual currency addresses are the digital locations to which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of letters and numbers. It is possible to "swap" or otherwise exchange cryptocurrencies by using Decentralized Exchanges (DEXs). DEXs allow for the swapping of one cryptocurrency for another by keeping large liquidity pools of various cryptocurrency types, which users can then swap between for a nominal fee. Unlike Centralized Cryptocurrency Exchanges, DEXs are not custodial, and allow for these swaps through the use of smart contracts, and therefore avoid the need for a third party to ever have custody of the cryptocurrencies being swapped. A DEX does not collect Know Your customer (KYC) information.

12. **Virtual Currency Exchange:** Virtual currency exchanges, such as Crypto.com are trading and/or storage platforms for virtual currencies. Many exchanges also store their customers' virtual currency in virtual currency accounts. These virtual currency accounts are commonly referred to as wallets and can hold multiple virtual currency addresses.

13. **Blockchain:** Many virtual currencies, including Ether, publicly record all their transactions on what is known as a blockchain. The blockchain is a distributed public ledger containing an immutable and historical record of every transaction utilizing that blockchain's technology. The blockchain can be updated multiple times per hour and records every virtual currency address that has ever received that virtual currency. It also maintains records of every transaction and all the known balances for each virtual currency address. There are different

blockchains for different types of virtual currencies. Due to the international nature of virtual currencies, most blockchain explorers operate using the Coordinated Universal Time (UTC) Zone. The times/dates used in this complaint are also based on the UTC time zone.

14. **Blockchain Analysis:** While the identity of a virtual currency address owner is generally anonymous, law enforcement can identify the owner of a particular virtual currency address by analyzing the blockchain. The analysis can also reveal additional addresses controlled by the same individual or entity.

15. **Company A:** Over the course of this investigation, the USSS conducted detailed blockchain analysis through "Company A," a company the USSS has contracted with to do blockchain tracing and analytics. The company is located in the United States, and provides services to government agencies and private firms allowing for the tracking of cryptocurrency payments. Company A's software helps track the public movements of cryptocurrency across the public blockchain ledger and private wallets.

16. **Hot Wallet:** A hot wallet is a software wallet that can be installed on a device that can access the internet, such as a desktop or mobile device. It is used to store cryptocurrency by connecting to the internet to access funds and create new transactions. Cold wallets, by contrast, do not connect to the internet, and can only be accessed with a recovery passcode.

17. **Exodus:** Exodus is a type of hot wallet that supports various cryptocurrencies.

18. **Stablecoins:** Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, Tether (USDT) is a stablecoin pegged to the U.S. dollar.

Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

19.     **Tether (USDT):** Tether Limited ("Tether") is a company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

20.     **Tron:** Tron is a decentralized blockchain-based network with a native cryptocurrency.

21.     **Allbridge.io:** Allbridge.io is a type of crypto bridge which allows different blockchain networks to communicate with each other and exchange assets and information. Crypto bridges circumvent the need to send funds through centralized exchanges in order to use different networks. Allbridge.io supports various transfer types and supports cross-chain swaps between Tron and other supported chains.

22.     The cryptocurrency ecosystem is used by criminals not only to receive victim money, but to launder it quickly, anonymously, and at scale. Like traditional money laundering, laundering money through cryptocurrency shares the same three stages of placement, layering, and integration, with different techniques applied within each:

- **Placement** – Criminals use non-custodial, or "private" wallets to initially receive victim funds. This is because law enforcement cannot attribute such wallets by blockchain analysis alone, are simple to create, and can accept large transaction amounts without additional scrutiny.

- **Layering** – Next, criminals will have victim funds transverse numerous private wallets, consolidate with other illegitimate and sometimes legitimate funds, and

be subjected to other more cryptocurrency-specific processes to obfuscate both the origin of, and the ultimate destination for, the victim funds.

- **Integration** – Finally, by using a diffuse network of "brokers," who agree to exchange cryptocurrency for fiat using various means, criminals render their proceeds liquid and fully integrated with the legitimate financial system.

B.   The Investment Fraud Scheme

23. This complaint involves criminal syndicates operating cryptocurrency investment fraud schemes. The scammers purport to be legitimate investors interested in providing capital to U.S.-based businesses. Scammers fool the victim into providing "test" transactions to ensure the wallets are "uncorrupted." The scammers advise that, once the victim makes the test payment, the money will be promptly returned. In reality, after the scammers build trust with the victim by returning a few small-dollar test transactions, they induce the victim to transfer a larger sum, which never returns and quickly dissipates.

24. The criminals then move the victim funds beyond the reach of law enforcement, typically by using non-custodial or "private" wallets that law enforcement cannot attribute using legal process or blockchain analysis alone. The criminals also transfer victim funds through multiple wallets before those funds reach a consolidation wallet, and commingle victim funds with other funds. Criminals frequently liquidate their cryptocurrency fraud proceeds by using "brokers" who agree to buy the cryptocurrency in exchange for other currency, including fiat currency.

C.   The Scheme and the Victim

25. The victim, a resident of the Eastern District of Virginia, owns a solar glass

manufacturing company (the "victim company") based in Woodbridge, Virginia, which is also within the Eastern District of Virginia.

26. On or about November 24, 2024, the victim reported information to law enforcement establishing that the victim had been defrauded out of nearly $1 million U.S. Dollar (USD) in or around November 2024 and in or around December 2024.

27. In or around September of 2024, the victim received an email from the unknown subject(s), purportedly a man named "Laurent". Laurent claimed to be representing Solid Invest, an investment and management consulting company interested in providing capital to the victim company. After the initial email, Laurent and the victim continued to communicate via email and video call.

28. Laurent advised that Solid Invest wanted to make a $60 million USD investment in the victim company. The money would come via international wire transfer from LGT Bank of Liechtenstein in two transactions approximately one week apart. The first transaction would be approximately $10 million USD, and the second transaction would contain the remaining $50 million USD. In order to proceed with the investment opportunity, Laurent requested the victim company's standard nondisclosure agreement.

29. Laurent and the victim discussed the nondisclosure agreement and investment package via email. They also agreed that the victim company would pay a commission for Laurent's work on the investment. That commission structure was added to the final term sheet.

30. Laurent then invited the victim to Barcelona, Spain, to meet in person to discuss the investment in more detail. On or about October 12, 2024, Laurent and the victim met in Barcelona for a lunch lasting approximately 3-4 hours with "Daniel," who represented himself as

the CFO of Solid Invest. Laurent also introduced the victim on a telephone call to a man purportedly named "Charles," who claimed to be the CEO of Solid Invest working out of Japan. During the meeting, Laurent also urged the victim to open an Exodus hot wallet to trade USDT.

31. Over the next three weeks, Charles and the victim engaged in negotiations over the terms of the investment deal. Included in the final term sheet was an advanced commission payment from the victim to Solid Invest.

32. At Charles' direction, on or about November 6, 2024, the victim opened a cryptocurrency account—a Coinbase prime account—to engage in USDT transactions with Charles. The victim then transferred $1,000,000 USD from a Charles Schwab business account to the Coinbase account, 0x4De58eAAe217F539ae3D6C6AA98eD89aeCda77C3. One week later, that $1,000,000 USD was exchanged for USDT. On or about November 20, 2024, the victim signed the final investment documents and sent them to Charles.

33. On or about November 22, 2024, Charles instructed the victim to add a simple extension to his Coinbase wallet address for the purpose of creating a transactional ledger. In reality, the request to change certain characters within the wallet address redirected the funds to the scammers' control.

34. Charles then instructed the victim to make a few small "test" transactions to ensure the wallets were uncorrupted. He advised that the transactions would be circular, meaning that the victim would transfer the funds and Charles would immediately return the funds. Charles explained that for the bank, LGT Bank of Liechtenstein, to process the investment wire, he would need to provide screenshots of the test transactions.

35. On or about November 22, 2024, the victim transferred 1,000 USDT from

0x4De58eAAe217F539ae3D6C6AA98eD89aeCda77C3 to 0x2979B8787B3984eE23986ec10a77d65F885D34d0 ("34d0") at approximately 11:58 UTC. The money returned at approximately 11:59 UTC.

36. Also on or about November 22, 2024, the victim transferred 99,920 USDT from 0x4De58eAAe217F539ae3D6C6AA98eD89aeCda77C3 to 34d0 at approximately 12:09 UTC. The money returned at approximately 12:09 UTC.

37. On or about November 22, 2024, at 12:32 UTC, the victim transferred approximately 946,734 USDT from 0x4De58eAAe217F539ae3D6C6AA98eD89aeCda77C3 to 34d0. The victim believed this 946,734 USDT was going to return instantly like the previous two transactions had, but it never did.

38. Charles informed the victim that due to congestion on the blockchain, the transaction was taking longer than expected. Charles then sent the victim a fictitious wire transfer confirmation from LGT Bank of Lichtenstein, mimicking the return of the funds, but the money never deposited into the victim's account. The victim attempted to get in touch with LGT Bank, but the bank would not disclose any information due to Swiss banking secrecy laws. At that point, the victim suspected that he had been scammed.

D. <u>Subsequent Movement of Funds on the Blockchain</u>

39. On or about November 22, 2024 at 12:36 UTC, the 946,734 USDT moved in whole from the 34d0 address to 0x21b45344e8B1C12aDFee33E013a1aee051743246.

40. From there, the USDT was transferred on the same day in four transactions to the same account, 0xfbc2Dc0E54B9d0Ec61C6c2620941377f20C73Af3.

- 13:22 UTC: 104.14 USDT

10

- 13:28 UTC: 312,428 USDT
- 14:55 UTC: 311,611 USDT
- 15:48 UTC: 322,750 USDT

41. Also on or about November 22, 2024, nearly all the 946,734 USDT was transferred to the Tron blockchain in six transactions totaling about 941,000 USDT.

42. The USDT funds were swapped to the Tron blockchain through Allbridge.io. The swap took place over six transactions:

- 13:42 UTC: 150,000 USDT
- 14:19 UTC: 162,532 USDT
- 15:01 UTC: 154,246 USDT
- 15:28 UTC: 154,247 USDT
- 16:02 UTC: 159,761 USDT
- 16:23 UTC: 159,761 USDT

43. After the funds were swapped to Tron, the address TAC21biCBL9agjuUyzd4gZr356zRgJq61b, owned by Allbridge.io, sent funds to two different wallets.

44. The first wallet, TJkHMbhqEx2M7zbimEiTHuJAAqC17Sska1 ("Sska1"), received five transactions on or about November 22, 2024. All transactions received to and sent from the wallet were victim funds, and no other USDT is commingled in this wallet:

- 13:59 UTC: 149,139 USDT
- 15:19 UTC: 153,391 USDT
- 15:46 UTC: 153,147 USDT

11

- 16:19 UTC: 158,631 USDT

- 16:41 UTC: 158,640 USDT

45. The second wallet, TDEFTGBu6QaccGfN4oxvHDuV8VR3jHVJu1 ("HVJu1"), received one transaction, also on or about November 22, 2024. This wallet contained commingled funds from an unknown source in addition to victim funds. The USDT moved through this wallet within hours of receipt.

- 14:36 UTC: 161,544 USDT

46. The funds then moved from HVJu1 to Sska1, the other wallet that received the newly converted Tron after the swap. In other words, approximately 158,000 USDT took a detour through HVJu1 to be reunited with the bulk of the victim funds in Sska1:

- 14:51 UTC: 158,437 USDT

47. Also on or about November 22, 2024, Sska1 sent funds to two separate wallets, TPZV1XGDEQCPZbVg668SGHpkrp3CR9ugDe ("9ugDe") and TP64GuWJSkXXbGzkJEg666TEMtGhoMVNr2 ("MVNr2").

48. 9ugDe received two transactions. As of the date of this complaint, this wallet received and sent only victim funds.

- 16:58 UTC: 103.91 USDT

- 16:59: 698,324 USDT

49. MVNr2 received one transaction of victim funds. This wallet is a consolidation wallet, having received other funds prior to the deposit of victim funds.

- 17:04 UTC: 31,174

50. Approximately four days later, on or about November 26, 2024, additional funds left Sska1 and moved to Defendant B in two transactions:

- 14:18 UTC: 100 USDT
- 14:20 UTC: 152,260 USDT

51. Defendant B was frozen by Tether at the request of USSS on or about December 2, 2024.

52. On or about November 30, 2024, the funds moved from 9ugDe to TBTuE5wnhe4FkNYFMmKjtGLTGVCUxUKSkf ("UKSkf") in two transactions:

- 16:42 UTC: 698,323 USDT
- 16:41 UTC: 105 USDT

53. That same day, the remaining funds from UKSkf moved to Defendant A in two transactions:

- 17:08 UTC: 105 USDT
- 17:09 UTC: 698,268 USDT

54  On or about December 2, 2024, Defendant A was frozen by Tether at the request of USSS.

55. On or about December 3, 2024, an additional transaction from UKSkf moved to Defendant A:

- 12:52 UTC: 105 USDT

56. These transactions were all traced by the USSS on the publicly available blockchain to the Defendant Property.

57. The below is a visual representation of the movement of the victim's funds.



58. There is no reason, economic or otherwise, for legitimate businesses or individuals to conduct cryptocurrency transfers in the above fashion. Each individual cryptocurrency transfer costs money. For USDT, that cost is paid via "gas" fees levied by operation of Tether. Businesses and individuals who simply seek to transfer legitimate funds from one address to another strive to minimize those fees by conducting transfers with as few transactions, or "hops," as possible.

59. The convoluted transactions and quick swaps from one type of cryptocurrency to another described above indicate that the motivation behind the transactions is to conceal the nature, origin, location, control, and ownership of the funds.

60. As of the date of this complaint, Defendant A contains 698,482.2222 USDT. Except for 3.19 USDT, the funds within Defendant A are directly traceable to the victim.

61. As of the date of this complaint, Defendant B contains 263,212.73392 USDT. Prior to receiving victim funds, Defendant B contained 143,386 USDT from a decentralized exchange based in Singapore. Accordingly, 143,386 USDT is commingled with 119,826.734 USDT in victim funds.

E. Report to Law Enforcement and Remediation

62. On or about November 24, 2024, the victim submitted a complaint to the USSS Baltimore Field Office and was interviewed by USSS Special Agent Michael Dickson.

63. Through subsequent investigation using Company A, the Defendant Property was traced to two unhosted wallets.

64. On or about December 1, 2024, the USSS sent a request to Tether to voluntarily freeze the Defendant Property in the two wallet addresses.

65. Tether informed the USSS that it froze the Defendant Property on or about December 2, 2024, thereby restricting all outgoing transactions from Defendant A and Defendant B. Tether also informed the USSS that, as of December 2, 2024, Defendant A contained 698,373.906543 USDT, and Defendant B contained 263,212.73392 USDT.

66. With the additional transaction from UKSkf to Defendant A in the amount of 105 USDT, *see* supra ¶ 55, and the 3.19 USDT that predated the deposit of victim funds, *see* supra ¶ 60, the total amount of USDT contained in Defendant A is currently 698,482.2222. The December 3, 2024 transfer of 105 USDT and the preexisting 3.19 USDT account for the discrepancy between the USDT currently contained in Defendant A and the USDT held by Defendant A at the time Tether froze it. Accordingly, all frozen funds contained in Defendant A are victim funds and funds involved in money laundering.

67. A tracing analysis of Defendant B indicates that no other USDT was transferred into Defendant B between receiving victim funds and being frozen by Tether. *See* supra ¶ 61. Accordingly, all frozen funds contained in Defendant B are victim funds and funds involved in money laundering.

68. Ultimately, the USSS obtained a lawful seizure warrant for the contents of the two wallet addresses on May 20, 2025.

69. On July 25, 2025, law enforcement transferred the Defendant Property in the amount of $961,694.95612 into a law enforcement-controlled Coinbase wallet.

**FIRST CLAIM FOR RELIEF**
**(Forfeiture under 18 U.S.C. § 981(a)(1)(A))**

70. The United States incorporates by reference paragraphs 1–69 above as if fully set forth herein.

71. Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 . . . of this title, or any property traceable to such property."

72. Title 18, United States Code, Section 1956(a)(1)(B)(i) imposes criminal liability on "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

73. As set forth above, the Defendant Property constitutes property involved in a violation of section 1956.

74. As such, the Defendant Property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## SECOND CLAIM FOR RELIEF
### (Forfeiture under 18 U.S.C. § 981(a)(1)(C))

75. The United States incorporates by reference paragraphs 1–69 above as if fully set forth herein.

76. Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title) or a conspiracy to commit such offense."

77. Title 18, United States Code, Section 1343 imposes a criminal penalty on any person who:

17

> having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice…

77. Title 18, United States Code, Section 1956(c)(7)(A) provides that the term "specified unlawful activity" includes "any act or activity constituting an offense listed in section 1961(1) of this title." Title 18, United States Code, Section 1961(1) lists "any act which is indictable under any of the following provisions of title 18, United States Code. . . section 1343 (relating to wire fraud)."

78. As set forth above, the Defendant Property constitutes criminal proceeds of the wire fraud scheme.

79. As such, the Defendant Property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

**PRAYER FOR RELIEF**

WHEREFORE, the United States prays that due process issue to enforce the forfeiture of the Defendant Property and that due notice be given to all interested parties to appear and show cause why said forfeiture of the Defendant Property should not be decreed, that the Defendant Property be condemned and forfeited to the United States to be disposed of according to law, and for such other and further relief as this Honorable Court may deem just and proper.

DATED this 4th day of November 2025.

                                      Respectfully submitted,

                                      LINDSEY HALLIGAN
                                      UNITED STATES ATTORNEY

By:    /s/ Annie Zanobini
        Annie Zanobini
        Assistant United States Attorney
        California Bar No. 321324
        2100 Jamieson Avenue
        Alexandria, Virginia 22314
        Office Number: (703) 299-3903
        Facsimile Number: (703) 299-3982
        Email Address: annie.zanobini2@usdoj.gov

        Rebecca C. Fisher
        Trial Attorney
        U.S. Department of Justice, Criminal Division
        1400 New York Avenue NW
        Washington, DC 20005
        Office Number: (202) 305-4461
        Email Address: Rebecca.fisher@usdoj.gov

## VERIFICATION

I, Cory Schweitzer, Special Agent with the United States Secret Service, declare under penalty of perjury as provided by 28 U.S.C. § 1746, that the foregoing Complaint for Forfeiture in Rem is based on information known by me personally and/or furnished to me by various federal, state, and local law enforcement agencies, and that everything contained herein is true and correct to the best of my knowledge.

Executed at _____, Virginia, this ___30___ of October, 2025

_Cory Schweitzer_
Cory Schweitzer, Special Agent
United States Secret Service